# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

ANTHONY AZEMA                                          CIVIL ACTION

VERSUS                                                 NO:  07-2833-LMA-SS

MICHAEL J. ASTRUE, COMMISSIONER
OF SOCIAL SECURITY

## REPORT AND RECOMMENDATION

The plaintiff, Anthony Azema ("Azema"), seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his claim for disability insurance benefits and a period of disability under Title II of the Social Security Act ("Act"), 42 U.S.C. § 423, and his claim for supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1382(a)(3).

## PROCEDURAL HISTORY

The procedural history of this matter is lengthy.  Azema's first application for benefits was filed on November 4,1996.  R. 17.  The pertinent background begins when an administrative law judge ("ALJ") denied an application for benefits on October 18, 2002.  R. 18.  The decision was upheld by the Appeals Council.  R. 18.  There was no appeal of that final administrative decision, and therefore the finding that Azema was not disabled through October 18, 2002 is res judicata.

Azema filed two applications for benefits which are at issue in this appeal.  The first was filed on June 9, 2003.  R. 69-71. Azema contended that he suffered from a heart condition, mental illness, back and leg ailments, and headaches.  R. 91.  On January 24, 2005, an ALJ denied that application. R. 268-280.  He sought review of the decision (the "first decision") with the Appeals

Council.  R. 283-88.

On February 14, 2005, Azema filed the second application.  R. 85-87.  On August 23, 2005, the Social Security Administration made a favorable determination on the second application.  R. 281.

On January 12, 2006, the Appeals Council notified Azema that: (1) it granted his request to review the ALJ's decision of January 24, 2005 on the first application; and (2) it reopened the August 23, 2005 favorable determination on the second application.  R. 294-97.  On May 26, 2006, the Appeals Council remanded both matters to an ALJ.  R. 298-302.

On September 30, 2006, a hearing was held before an  ALJ.  R. 450-71.  On October 12, 2006, the ALJ issued an unfavorable decision regarding both applications.  R. 17-34.  On April 13, 2007, the Appeals Council denied Azema's request for review.  R. 6-8.

On May 14, 2007, Azema filed a complaint for review with this Court.  Rec. doc. 1.  The parties submitted cross-motions for summary judgment.  Rec. doc. 14 and 16.  Azema is represented by counsel in this Court.

## STATEMENT OF ISSUES ON APPEAL

1.      Did the ALJ err by finding that Azema's condition did not meet Listing 12.05?

2.      Was the ALJ's decision based on substantial evidence as required by 20 C.F.R. § 404?

3.      Did the ALJ err in failing to accord controlling weight to Dr. Parsa's opinion?

4.      Did the ALJ err by substituting his lay opinion for that of a medical expert?

## THE COMMISSIONER'S FINDINGS RELEVANT TO ISSUES ON APPEAL

The ALJ made the following findings relevant to the issues on appeal:

1.      Azema met the disability insured status requirements of the Act on October 27, 1996, his alleged onset date, and continued to meet it through December 31, 2001.

2

2.      Azema has not engaged in substantial gainful activity since his alleged onset date of October 27, 1996.

3.      The medical records presents evidence of borderline intellectual functioning and peripheral arterial disease which are severe conditions within the constraints of <u>Stone v. Heckler</u>, 752 F.2d 1099 (5th Cir. 1985) and SSR 96-3p.  Major depression is non-severe.

4.      Azema's conditions singly nor in combination, neither meet nor equal the criteria for any impairment set forth in 20 CFR, Appendix 1, Subpart P Regulations No. 4.  Specifically Listing 4.12 Peripheral arterial disease and 12.05 Mental Retardation are not met.

5.      Azema's assertions, as well as those of his wife, relative to symptomatology, pain, functional limitations and restrictions on activities of daily living are exaggerated, are found to lack corroboration and substantiation in the medical evidence, and are not credited.

6.      Azema retains the following functional capacity.  He is a younger individual with a seventh grade special education.  He can lift/carry up to twenty pounds occasionally and ten pounds frequently.  He can sit and stand each for six hours out of an eight-hour day.  He can balance four to five hours a day on his feet.  He can walk for at least two hours out of an eight-hour day.  Cognitively/socially, he can perform simple (one to two step instructions) routine repetitive work.  Work should involve no more than moderate contact with others and inanimate work is preferred.

7.      Azema is forty-four years of age with a seventh grade education and past relevant work as general laborer for contractor.

8.      Azema's restrictions prevent him from performing his past relevant work as general laborer.

9.      Azema is capable of performing work activities, which were deemed existing in significant numbers throughout the national and statewide economies.

10.     Azema has not been under a "disability" as defined in the Social Security Act at any time through the date of this decision.

R. 33-34.

## ANALYSIS

a.      **Standard of Review.**

        The function of this court on judicial review is limited to determining whether there is

substantial evidence in the record to support the final decision of the Commissioner as trier of fact

and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000); Spellman v. Shalala, 1 F.3d 357, 360 (5th Cir. 1993).   Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971); Newton, 209 F.3d at 452. Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion.   Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  This court may not re-weigh the evidence, try the issues *de novo* or substitute its judgment for the Commissioner's.  Id.; Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91, 113, 112 S.Ct. 1046, 1060 (1992).  Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it.  Villa, 895 F.2d at 1022; Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

To be considered disabled and eligible for disability insurance benefits, plaintiff must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability.  20 C.F.R. §§ 404.1501 to 404.1599

4

& appendices, §§ 416.901 to 416.998 (1997). The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity. Id. §§ 404.1520, 416.920; Newton v. Apfel, 209 F.3d at 453; Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 514 U.S. 1120, 115 S. Ct. 1984 (1995).[1] The five-step inquiry terminates if the Commissioner finds at any step that the claimant is or is not disabled. Leggett v. Chater, 67 F.3d 558, 564 (5th Cir. 1995).

The claimant has the burden of proof under the first four parts of the inquiry. Id. If he successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing. Greenspan, 38 F.3d at 236; Kraemer v. Sullivan, 885 F.2d 206, 208 (5th Cir. 1989). When the Commissioner shows that the claimant is capable of engaging in alternative employment, "the ultimate burden of persuasion shifts back to the claimant." Id.; accord Selders, 914 F.2d at 618.

The Court "weigh[s] four elements of proof when determining whether there is substantial

---

[1] The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled. 20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled. Id. §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence. Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated. If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled. Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy. If the claimant cannot meet the demands, he or she will be found disabled. Id. §§ 404.1520(f)(1), 416.920(f)(1). To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns. When the findings made with respect to claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled. Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 (1994) ("Medical-Vocational Guidelines").

evidence of disability: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) [her] age, education, and work history."   <u>Martinez v. Chater</u>, 64 F.3d 172, 174 (5th Cir. 1995).   "The Commissioner, rather than the courts, must resolve conflicts in the evidence."   <u>Id</u>.

b.   **<u>Testimony at the November 16, 2004 Hearing</u>.**[2]

Azema completed the seventh grade.  R. 434.  He was married.  R. 434.  His wife worked. R. 436.  She paid the bills.  R. 436.  He had one child under the age of eighteen.  R. 434.  He last worked in 1996 as a construction laborer.  R. 436-437.  He worked mostly as a helper carrying materials.  R. 437.  Most of his work was laying pipe for pump stations.  R. 438.

Azema did not work because he felt bad.  R. 436.  He had headaches.  R. 437.  He could not stay in the sun long before he got headaches.  R. 437.  He was short-winded.  R. 437.  He could not remain focused.  R. 437.  He took medication to help him remained focused, but he had good and bad days.  R. 437.  He did not suffer side-effects from his medication.  R. 444.

In 1996, he drank a lot.  R. 437.  He was treated for alcohol abuse.  R. 435.  He was arrested for disturbing the peace.  R. 435.  He was member of an AA group, but at the time of hearing he had stopped. R. 435-36.  At the time of the hearing he had not relapsed and returned to drinking.  R. 438.

Azema went to a mental health clinic and a substance abuse clinic.  R. 438.  He attended a group session once a week.  R. 438.  At the mental health clinic he reported: difficulty sleeping; good days and bad days; some headaches; pain in his legs; hearing things; and seeing things.  R. 439-40.  He did not go to the store with his wife as his doctor suggested.  R. 443.  He walked two

---

[2] Azema's memorandum in support of his motion for summary judgment refers to this hearing as well as the one conducted on September 20, 2006.  Rec. doc. 14 at p. 7.

or three blocks to exercise his legs as instructed by his doctor.  R. 442-43.  He had a lot of pain in his leg.  R. 442-43.  At times he could barely walk.  R. 443.  He did not have a problem standing. R. 443.

Azema smoked about a pack of cigarettes a day.  R. 443.  He took care of his personal hygiene needs.  Id.  He had difficulty finishing chores around the house, like sweeping.  R. 442.  He tried to cook at times.  R. 444.  He liked to be alone.  R. 440.  He did not do anything with his step son, who was still in school.  R. 441.  He talked to his neighbor.  R 442.  He like to work with his flowers, but he had not done that in a while.  R. 441-42.

c.      **Testimony at the September 20, 2006 Hearing**.[3]

Azema could not read or write.  R. 454.  He could count change, but was not good at it.  R. 454-55.  He could not drive.  R. 455.  His wife did all the cooking.  Id.  He was not in the mood to do household chores.  R. 455.  He spent the day sitting down.  Id.  He watched television.  R. 455. He sat outside on the porch if there were only a few people outside.  Id.  The noise from a lot of people disturbed him.  Id.

Azema tried to walk every day as instructed by his doctor.  R. 455-56.  If he walked more than a block, his legs hurt.  R. 455.  At night they hurt when he lay down.  R. 455.  He had trouble standing because sometimes his leg gave out on him.  R. 456.  If he sat too long, his legs became stiff and numb.  R. 456.  He kept his legs up most of the day.  R. 456.

Azema heard voices about three or four times a week.  R. 456-57.  He could not understand the voices.  R. 457.  He saw things sometimes.  Id.  He stopped working because he had a nervous breakdown.  Id.  He liked to fish, but he did not do it any more.  Id.

_____

[3]  To the extent the testimony from the September 20, 2006 duplicates the prior hearing, it is omitted from the summary.

Azema's wife picked out his clothes.  R. 457.  She shaved him and cut his hair.  Id.  She reminded him to bathe.  R. 458.  He was able to stay in the house by himself when she was gone.  Id.  He did not go to church.  Id.  He did not know who was president.  Id.

Azema's wife testified that her husband was home alone during the day.  R. 465.  He did not provide any help at the house.  R. 465 and 569-70.  She would not let him help around the stove for fear he would burn down the house.  R. 470.  They did not go anywhere socially.  R. 465.  He went to church with her when there was a brunch and he could eat something.  R. 465-66.  He did not go shopping with her.  R. 466.

She testified that he took medicine given to him by the mental health clinic, but it did not help.  R. 467.  She believed his condition had become worse.  R. 467.  He saw things.  R. 467.  He mistook a cigarette lighter for a cell phone.  R. 467-68.  He heard voices.  R. 468.  He believed the people on the television shows were watching him.  R. 468-69.  He had trouble with memory and concentration.  R. 469.  She would tell him she was going to the store and then he would ask where she was going.  R. 469.  He did not drink alcohol.  R. 470.  He stopped smoking and then started back.  R. 470.

In response to the ALJ's hypothetical question, the vocation expert testified that Azema could perform light unskilled positions which were available in the state and national economy.  R. 461-62.  d.  **Medical Evidence**.

2000

On November 21, 2000, there was a telephone call to the Lafourche Mental Health Center ("LMHC") from Azema's counselor at the Thibodaux Addictive Disorders Clinic ("Thibodaux Addictive").  Azema was "crying" because he could not obtain his medication from LMHC.  The

counselor was told that Azema could return for a crisis assessment.  The counselor reported that such

an assessment was not needed.  Instead, the counselor indicated that she would inquire at Leonard

J. Chabert Medical Center ("Chabert") about its medical assistance program.  R. 148.

2002

On March 5, 2002, Azema was seen at Chabert's Ambulatory Care Adult Clinic - Internal

Medicine/Family Practice for a refill on his medication for depression.  R. 173.  On March 6, 2002,

it was noted that he had been sober for five years.  R. 169-70.  On March 31, 2002, he returned to

Chabert for complaints of chest pain.  R. 172.  He was told to stop smoking and enroll in a smoking

clinic.  R. 171.  On April 3, 2002, he was seen at Chabert for a follow-up on the chest pain.  R. 170.

On April 30, 2002, there was a left heart catheterization and coronary angiography at Thibodaux

Regional Medical Center.  The finding was no significant coronary artery disease. R. 163-64.  He

was diagnosed with chest pain, hypertension and tobacco use disorder.  R. 177.  On May 22, 2002,

he returned to Chabert for a follow-up.  R. 161.

On June 11, 2002, Azema called Chabert to report that he had no money to purchase

medication.  He was told to come by and he would be given a sample.  R. 159.

On July 10, 2002, Azema was seen at LMHC for screening for admission.  In the past LMHC

had diagnosed him with major depression.  Thibodaux Addictive reported that:  he had been sober

for about two years; he attended sessions weekly; and he won an award for attendance.  It was

concerned about some of his behavior and his inability to obtain medication consistently from

Chabert.  R. 148.

On July 18, 2002, Azema underwent a psychological evaluation at LMHC.  R. 147.  He was

neat, well groomed and cooperative.  He reported that:  his medicine was not doing any good; he had

9

headaches, depression, flashbacks and behavior that frightened his wife; he had a heart attack in May, 2002; although he had been told to stop, he continued to smoke; he had stopped drinking about two years earlier; he did yard work and grew flowers; his wife did the cooking and housework; and he walked every day for about an hour. The diagnosis was depression. R. 149-52. On July 25, 2002, he was seen by Darren Parsa, M.D., a psychiatrist at LMHC, for a psychiatric evaluation. The diagnosis was major depression, recurrent and psychotic features. Medication was prescribed. R. 146-47.

On August 6, 2002, Azema was seen at Chabert for a follow-up and he reported numbness in his arm at times. R. 158.

On August 16, 2002, Azema was seen at LMHC by Dr. Parsa. Azema reported: improved mood, sleep, energy and appetite; auditory hallucinations were much improved; chronic problems concentrating; and improvement with medication. His affect was appropriate and in the full range. R. 146-47.

On September 16, 2002, Azema was seen at LMHC. He was described as orientated and casually groomed. He reported that: the medication was settling into his system; his sleep and appetite were good; he was attending weekly sessions at Thibodaux Addictive; he felt better; and he had stopped drinking. He was goal oriented and his mood was good. R. 146.

On October 14, 2002, Azema was seen at LMHC. He was orientated and casually groomed. He demonstrated a depressed affect. He reported that: he was a little down; his sleep and appetite were good; and he had some auditory hallucinations. R. 145.

On November 15, 2002, Azema was seen at LMHC by Dr. Parsa. He reported that: he was depressed because he had been denied disability; his moods were up and down; his overall mood

was improved; he was eating well; and he had chronic problems with concentration and memory. His affect was described as full range and appropriate.  The diagnosis was major depression.  He did not want to change his medication because his current medication was helpful.  R. 144-45.

On December 3, 2002, Azema failed to appear for an appointment at Chabert.  R. 157.

On December 10, 2002, Azema was seen at LMHC.  He was oriented and casually groomed. He reported that: he was doing well; his sleep was pretty good; his appetite was good; he had no problems; he kept busy in his garden; he was not using drugs or alcohol; and he continued to attend group meetings.  His mood and affect were normal.  R. 142.

2003

On January 8, 2003, Azema was seen at LMHC.  He did not report any problems.  He was goal orientated.  R. 143.

On February 7, 2003, Azema was seen at LMHC by Dr. Parsa.  Azema reported that: he experienced difficulty sleeping; his appetite was good; he had no feelings of depression; and he had no auditory or visual hallucinations.  His affect was full range and appropriate.  His thought processes were goal directed.  He was tolerating his medication.  His medications were adjusted. R. 143.

On February 11, 2003, Azema was seen at Chabert for a follow-up.  R. 156.

On March 10, 2003, Azema was seen at LMHC.  He was oriented and casually groomed. His sleep was improved.  He attended AA group meetings and enjoyed them.  R. 141.

On April 8, 2003, Azema signed a Thibodaux Addictive master plan for alcohol dependence with a four month program for remaining alcohol and drug free.  R. 129.

On April 16, 2003, Azema was seen at LMHC.  He was orientated and casually groomed.

11

He reported that: he was up and down; he had headaches and numbness on his right side; he had no other problems; he was attending group meetings; he got a lot out of the meetings; his sleep and appetite were good; and he had no symptoms of depression.  R. 140.

On May 23, 2003, Azema was seen at LMHC by Dr. Parsa.  He reported that:  his sleep was mildly improved; his appetite was good; and he had no hallucinations or delusions.  His affect was full range and appropriate.  R. 138 and 140.

On June 17, 2003, Azema was seen at LMHC.  His appearance was stable.  He was oriented and nicely clothed.  He reported that:  he had good days and bad days; his sleep and appetite were good; he stayed inside a lot because of the heat; he went out in the evening when it cooled down; he watched TV; he visited his neighbors; he enjoyed working in the garden; his application for disability was denied; he was reapplying; and he attended group meetings at Thibodaux Addictive. R. 138-39.

On July 21, 2003, Azema was seen at LMHC.  He was orientated and casually groomed.  He reported that: a member of his family died; the funeral service made him nervous; he was not depressed; he did not want to be around people; and he enjoyed his group meetings.  R. 238.

On August 6, 2003, Azema was seen at Chabert with complaints of discomfort in his hip and neck. R. 224.

On August 13, 2003, a medical consultant reviewed the records and found that Azema's depression had been in remission for two years.  R. 206-217.

On August 18, 2003, Azema was seen at LMHC.  He reported that:  he was up and down; he was thinking a lot about death; he had dreams about death; he related it to the death of his brother-in-law; he did not have thoughts of suicide; and he no psychotic symptoms.  R. 237.

12

On September 15, 2003, Azema was seen at LMHC.  He reported that:  he was doing all right; he was not worried about his application for disability; he learned that his sister had been receiving his Social Security checks; and at first he wanted to kill her, but he no longer felt that way. His affect was normal.  R. 236.

On September 15, 2003, Miljana Mandich, M.D., a specialist in internal medicine, performed a consultative examination on Azema.  R. 187-95.  Dr. Mandich reported that he appeared to have diminished intellectual capacity.  He did not appear psychotic.  R. 190.  Dr. Mandich reported on his physical examination of Azema,  R. 191-92, stating that chest x-rays did not reveal any evidence of active pulmonary or cardiac pathology.  R. 186.

On September 22, 2003, a medical consultant reviewed the medical records.  He did not assign any physical limitations which would prevent Azema from working.  R. 198-205.

On October 17, 2003, Azema was seen at LMHC by Dr. Parsa.  Azema reported that:  he had difficulty sleeping; and his concentration, energy and appetite were down.  He was goal directed and was tolerating the medication.  R. 235-36.

On November 6, 2003, Azema was seen at Thibodaux Regional Medical Center for lacerations on two of his fingers on his left hand.  R. 253-54 and 257.

On November 12, 2003, Azema was seen at LMHC.  He was orientated and casually groomed.  He reported that:  he was about the same - up and down; and he was upset because he was turned down for Social Security benefits when people who never worked were able to get them.  R. 234.

On December 17, 2003, Azema was seen at LMHC.  He was oriented and casually groomed. He reported that: he was doing well; his sleep and appetite were good; he had no psychotic

13

symptoms; he attended his AA group sessions; he had a lawyer representing him on his Social Security claim; and he looked forward to being with family for the holidays.  His mood was good. R. 234.

2004

On January 21, 2004, Azema was seen at LMHC.  He was orientated and casually groomed. He reported that:  he was doing well; his sleep was improved; he was trying to cut-back on what he ate; he had a nice holiday; he was not tempted to drink during the holidays; he helped some around the house when he felt up to it; and he attended meetings with his group.  He was encouraged to go out more with his wife.  R. 232.

On February 12, 2004, Azema was seen at Chabert with complaints of a cough and runny nose.  He was told to stop smoking.  R. 353-56.

On February 20, 2004, Azema was seen at LMHC by Dr. Parsa.  Azema reported that:  he was doing well; he had no problems; and his sleep, appetite and mood were satisfactory.  His affect was full range and appropriate.  R. 232

On March 17, 2004, Azema was seen at LMHC.  He reported that:  he was doing well; he had some problems with his legs from arthritis; he worked in the yard; he continued to attend his group meetings; he was trying to lose weight; and he had trouble concentrating.  His mood was good.  R. 231A.

On April 14, 2004, Azema was seen at LMHC.  He reported that: he had problems with his legs; he had no psychotic symptoms; he went to his group meetings; and he contacted another lawyer to assist him with his Social Security claim.  R. 231A.

On May 21, 2004, Azema was seen at LMHC by Dr. Parsa.  Azema reported that he was

14

doing well.  His mood was improved.  R. 231.  On May 21, 2004, Dr Parsa completed a mental residual functional capacity evaluation.  With a few exceptions, Dr. Parsa indicated that Azema's impairments seriously affected his ability to function in a work setting.  Dr. Parsa noted that Azema reported that he had to quit working as a laborer for a contractor due to his inability to concentrate and the deterioration of his psychiatric condition.  R. 131-34.

On June 1, 2004, a form was completed by a counselor at Thibodaux Addictive.  Azema's performance was evaluated as good in four categories.  A fifth category was not applicable.  He had attended 188 sessions of the dual diagnosis group.  R. 130.

On June 4, 2004, Azema was seen at the Thibodaux Regional Medical Center for complaints of chest and left knee pain.  X-rays were taken.  R. 251.  He was told to wear an ace bandage.  R. 252.

On June 21, 2004, Azema was seen at LMHC.  He was orientated and casually groomed.  He reported that:  he was doing well; his sleep and appetite were good; he did not have any psychotic symptoms; he looked forward to the vegetables he was raising in his garden; and he went to his group meetings.  R. 334.

On July 19, 2004, Azema was seen at LMHC.  He was orientated and casually groomed.  He reported that:  he was doing well; the heat limited his outdoor activity; he had no psychotic symptoms; and he was trying to diet.  R. 334.

On August 11, 2004, Azema was seen by Dennis Spears, M.D., a psychiatrist, for a consultative examination.  The diagnosis was history of alcohol dependence and possible nicotine dependence.  He did not detect any obvious depression or psychosis.  He categorized Azema in the dull-normal intelligence range at best and perhaps in the borderline range.  R. 241-244.

15

On August 17, 2004, Azema was seen at LMHC.  He was cooperative and casually dressed.  He reported that: his appetite was good; he tried to walk and ride a bike; his legs tired easily; he slept well; he kept to himself; and he went to his group meetings.  R. 262 and 267.

On August 17, 2004, Azema failed to appear for an appointment at Chabert.  R. 370.

On September 13, 2004, Azema was seen at LMHC by Dr. Parsa.  He was orientated and casually groomed.  He reported that: his wife was laid off which created financial problems; he attended his group meetings; and an attorney had his Social Security application.  R. 267.

On September 20, 2004, Azema failed to appear for an appointment at Chabert.  R. 369.

On October 19, 2004, Azema was seen at Chabert with complaints of extreme fatigue and pain in his back and side.  R. 365-68.

On October 21, 2004, Azema was seen at LMHC by Dr. Parsa.  Azema reported that he had difficulty sleeping.  His affect was full range and appropriate.  R. 261.

On November 24, 2004, Azema was seen at LMHC.  He was orientated and casually groomed.  He reported that:  he missed an appointment because of a Social Security hearing; his sleep had improved; and he went to his AA meetings.  His mood was good, and he was goal orientated.  R. 330.

On December 20, 2004, Azema was seen at LMHC.  He was orientated and casually groomed.  He reported that: he was doing well; he had gone to AA meetings; and he did not have any urge to resume drinking during the holidays.  R. 330.

<u>2005</u>

On January 18, 2005, Azema was seen at LMHC.  He was orientated and casually groomed.  He reported that:  he was doing pretty well; he enjoyed the holidays; and he did not have any urge

16

to drink.  R. 330-31.

On January 20, 2005, Azema was seen at Chabert for a follow-up appointment.  R. 358-61.

On February 23, 2005, Azema was seen at LMHC.  He reported that: he canceled an appointment because he went to a Social Security meeting; his application for benefits was rejected; he was not having any problems; he planned to re-apply; he denied feeling angry toward his sister for taking his Social Security checks; his sleep and appetite were good; he had no psychotic symptoms or thoughts of suicide; and he had medical problems with his leg.  R. 331 and 329.

On February 24, 2005, Azema was seen at Chabert for a vascular blockage condition.  R. 348-352.  A stress test was negative.  R. 350.

On March 22, 2005, Azema was seen at LMHC.  He was orientated and casually groomed. He reported that: he was taking it easy; he had a blockage in his leg; he had not received a report from the heart surgeon; he was trying to quit smoking; his sleep and appetite were good; and he attended his group sessions.  R. 417.

On March 31, 2005, Azema was seen at Chabert for a follow-up appointment.  R. 345-47.

On April 18, 2005, Azema was seen at LMHC.  He was orientated and casually groomed. He reported that:  he was doing all right; he quit smoking; he gained weight; and he had experienced audio hallucinations.  R. 416.

On April 21, 2005, Azema was seen at Chabert for a follow-up appointment.  R. 344.  On April 28, 2005, Azema was seen at Chabert's surgery clinic for a follow-up appointment for intermittent limping.  R. 343.  On May 20, 2005, he was seen at the radiology department at Chabert Hospital for an abdominal aortogram.  No significant vascular areas were noted.  R. 342.

On May 25, 2005, Azema underwent a psychological evaluation by William E. Fowler,

17

Ph.D. a consultative psychologist.  R. 371-73.

On May 26, 2005, Azema was seen at LMHC by Dr. Parsa.  His affect was full range and appropriate.  Azema reported that:  he was doing well; and he did not have any problems.  R. 415-16.

On June 10, 2005, Azema was seen at Chabert's surgery clinic.  It was recommended that he stop smoking.  R. 341.

On June 16, 2005, a medical consultant reviewed the records and determined that Azema did not meet the listing requirements for a mental disorder.  R. 375-92.

On June 20, 2005, Azema was seen at LMHC.  He was orientated and casually groomed.  He reported that:  he was doing all right; a close friend had died; his sleep and appetite were good; and he had no psychotic symptoms.  R. 414-15.

On July 18, 2005, Azema was seen at LMHC.  He was orientated and casually groomed.  He reported that:  his wife was laid off; as a result he was not sleeping; and he continued his efforts to obtain Social Security benefits.  R. 414.

On August 11, 2005, Azema's medical records were reviewed by a medical consultant concerning the vascular disease diagnosis.  The consultant concluded that he retained the capacity to perform light duty work.  R. 393-401.

On September 19, 2005, Azema was seen at LMHC.  He was orientated and casually groomed.  He reported that: he came through Hurricane Katrina without problems; and he continued to attend AA meetings.  His mood was pretty good.  R. 412.

On October 20, 2005, Azema was seen at LMHC.  He was orientated and casually groomed.  He reported that:  he was awarded disability benefits and would receive Medicare; he was sleeping

and eating well; and he was watching his food consumption. .  R. 412.

On October 24, 2005, Azema went to Chabert for a circulation problem in his leg.  R. 425-27.

On November 16, 2005, Azema was seen at LMHC.  He was casually groomed but appeared neater than usual.  He reported that:  the disability benefits really helped; and he went to the group meetings.  R. 413.

On December 23, 2005, Azema was seen at LMHC by Dr. Parsa.  Azema reported that:  he was doing well; he did not have any problems; and he was tolerating his medication.  His affect was full range and appropriate.  R. 413.

<u>2006</u>

On March 17 and April 28, 2006, Azema canceled his appointments at LMHC.  R. 411.

On April 24, 2006, Azema was seen at Chabert for a circulation problem in his leg.  He also reported back pain.  R. 422-24

On June 1, 2006, Azema was seen at LMHC by Dr. Parsa.  He reported that: his mother died; he grieved for her but was coping; he was sleeping and eating well; he was attending counseling at Thibodaux Addictive which helped; and he had been sober for three to four years. His affect was full range and appropriate.  R. 410-11.

On August 16, 2006, Azema underwent a psychological evaluation before Scuddy Fontenelle, Ph.D., at the request of the Disability Determinations office.  R. 402-09.

e.      **Plaintiff's Appeal.**

<u>Issue no. 1</u>.      Did the ALJ err by finding that Azema's condition did not meet Listing 12.05?

Azema contends that his mental condition meets the requirements of Listing 12.05-Mental

Retardation.     "Mental retardation refers to a significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period . . . before age 22.  20 C.F.R.  part 404, subpart P, app. 1.  section 12.05.  The required level of severity for this disorder is met when the requirements in one of four categories are satisfied.  Id.

One of these categories requires a valid verbal, performance, or full scale IQ of 59 or less. Id.  Azema argues that he has such a score and therefore he meets the criteria for Listing 12.05B.

One of the categories requires a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.  In the alternative, Azema urges that he has such a score, he suffers from multiple conditions which interfere with his ability to work, and he therefore meets the criteria for Listing 12.05D.

The Commissioner responds that there is substantial evidence to support the findings that: Azema exaggerated his symptoms; he had borderline intellectual functioning, not mental retardation; his IQ scores were not valid; and he did not possess the required physical or mental impairment.

The ALJ determined that Azema did not meet the listing requirements for Mental Retardation.  R. 22.  He found that mental retardation was not a medically determinable condition. R. 23.  He found that Azema had borderline intellectual functioning.  R. 23.  He found that Azema had excellent adaptive functioning.  He cited Azema's independent living, social skills, personal hygiene and other traits.  R. 23.  The ALJ noted that Azema worked in the past at un-skilled heavy labor which provided self-support for himself and his wife.  R. 23.  He noted Azema's concern for

his health, his ability to maintain his sobriety, and his participation in AA meetings.[4]  R. 23.  R. 23. The ALJ found that Azema could carry out the activities of daily living.  R. 23.  It was noted that Azema never required hospitalization for depression.  R. 24.

IQ tests were administered by two psychologists.  The ALJ assigned great weight to the opinions and conclusions of Dr. Fowler, who found that Azema's IQ scores were invalid because of questionable performance during the interview and testing.  R. 28-29.  The ALJ assigned no weight to the opinions and conclusions of Dr. Fontenelle.

The ALJ found that the assertions of Azema and his wife regarding his limitations and restrictions were exaggerated and were not corroborated by the medical evidence.  The ALJ described their testimony at the hearing as portraying Azema as totally inept in day to day living, unable to make decisions and requiring constant supervision.  R. 25.

The medical evidence begins in November 21, 2000, with the attempt by the counselor at Thibodaux Addictive to secure medications for Azema from LMHC because of problems in obtaining them from Chabert.  R. 148.  Azema was later admitted to the program at LMHC.  The psychological evaluation reported that Azema's current medication was not helping.  R. 149-52. Dr. Parsa completed a psychiatric evaluation and prescribed new medication.  R. 146.  Less than month later, Azema returned to Dr. Parsa, who noted that Azema reported improved mood, sleep, energy and appetite.  The auditory hallucinations were less frequent and his affect was appropriate and in the full range.  R. 146-47.

The medical evidence includes nearly four years of records from LMHC after his admission

---

[4]  Working for years despite impairments which are claimed to be disabling may support a finding of not disabled.  Vaughan v. Shalala, 58 F.3d 129, 131 (5th Cir. 1995).  A claimant's daily activities may properly be considered when deciding a claimant's disability status.  Leggett v. Chater, 67 F.3d 558, 565 n.12 (5th Cir. 1995).

to the program on July 18, 2002.  He returned to LMHC almost every month.  He participated in group sessions at Thibodaux Addictive.  He did not resume drinking.  He reported going to AA meetings.  The LMHC reports usually began by noting that Azema was orientated and casually groomed.  Dr. Parsa's notes reported that his affect was appropriate and in the full range.  His condition was well controlled with medication.  During these four years Azema's principal problems were associated with the death of family or friends and the status of his applications for Social Security benefits.

Dr. Mandich saw Azema on one occasion about a year after he began receiving treatment at LMHC.  Azema reported a bad heart, problems with his nerves, and leg cramps.  Dr. Mandich reported that he ambulated without difficulty.  A cardiac catheterization and coronary angiogram in April 2002 did not reveal any coronary artery disease at all.  The neurological examination was negative.  Dr. Mandich reported that he appeared to have diminished intellectual capacity but he did not appear psychotic.  R. 187-92.

On May 21, 2004, Dr. Parsa completed a four page mental residual functional capacity form by indicating whether the degree of impairment was mild, moderate, marked or extreme.  With a few exceptions, Dr. Parsa indicated that all were marked.  He reported that Azema's condition would deteriorate in a work-like setting because Azema told him he quit working in 1994 because he was unable to concentrate and his psychiatric condition was becoming worse.  R. 131-34.

On August 11, 2004, Azema was seen by Dr. Spiers, a psychiatrist.  Azema knew that he was being evaluated for his application for Social Security benefits. He had no obvious neurological defects.  He did not appear psychotic and was not obviously depressed.  He appeared to be of dull-normal to borderline intelligence.  His memory functions were intact.  His insight and judgment

appeared adequate.  R. 241-44.

Azema told Dr. Spiers that for a good while he had suffered from an inability to sleep, problems with his nerves and headaches.  R. 241.  On June 21, 2004, less than two months before Dr. Spiers' examination, Azema reported to LMHC that he was doing well, his sleep and appetite were good, and he did not have any psychotic symptoms.  R. 334.  On July 19, 2004, less than a month before the Spiers examination, Azema reported that he was doing well and he had no psychotic symptoms.  R. 334.  On August 17, 2004, less than a week after the Spiers examination, he reported that he slept well.  R. 262 and 267.

On May 5, 2005, Azema underwent a psychological evaluation with Dr. Fowler.  He reported that he had a plate in his head.  R. 371.  There is no evidence of this in the record.  He told Dr. Mandich that he suffered a head injury in a car accident as a child but it was not serious.  R. 188.

Dr. Fowler reported that Azema showed poor effort on the tests and therefore the results were not reliable.  The performance on the testing was questionable.  Dr. Fowler reported that the testing was "thought to be an underestimate of his ability, but he is probably in the mildly mentally retarded range."  R. 373.

On August 16, 2006, Dr. Fontenelle conducted a psychological evaluation which produced the test results relied upon by Azema to contend that he meets the requirements for the Mental Retardation listing.  R. 402-409.  Mrs. Azema was the primary informant for social information in the evaluation.  R. 402.  There is no evidence that Mrs. Azema was required to do this on other occasions for Azema.  For example, the records from LMHC do not indicate that she was ever present.

There is substantial evidence to support the ALJ's findings that:  (1) the statements by

Azema and his wife at the hearing before the ALJ and at Dr. Fontenelle's evaluation were exaggerated and not credible; and (2) the IQ scores were not valid.

Even with a valid IQ score of 60 through 70, it would be necessary for Azema to possess a physical or other mental impairment imposing an additional and significant work-related limitation of function.  There is substantial evidence to support a finding that he did not possess such an impairment.  The evidence from Azema's physical examinations, for example the examination by Dr. Mandich (R.187-192), demonstrates that his vascular disease did not impose significant limitation on his capacity to walk or stand.  Tests were negative for cardiac disease.  R. 186 and 350.  The LMHC records demonstrate that once Azema was given appropriate medication for his condition and was regularly monitored, he did not exhibit symptoms of depression.  There is substantial evidence to support the finding that Azema exaggerated his symptoms of depression and psychotic features when he believed it would aid his applications for Social Security benefits.

There is substantial evidence to support the ALJ's finding that Azema did not meet the Listing requirements for Mental Retardation.

<u>Issue no. 2.</u>       Was the ALJ's decision based on substantial evidence as required by 20 C.F.R. § 404?

Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  <u>Richardson</u>, 91 S.Ct. at 1427.  Azema contends that three statements by the ALJ are not supported by substantial evidence: (1) "[c]laimant has excellent adaptive functioning in that he copes well with common life demands and meets the standard of personal independence expected of someone his age;" (2) "[c]laimant has adequate expressive and receptive language skills and can write in a persuasive manner to influence others to think his way;" and (3) "[c]laimant has never required institutionalization based solely on depression."  R 23-24.

To demonstrate the lack of evidence for the first statement, Azema cites the testimony by his wife and himself at the hearing.  The ALJ, however, found that they exaggerated their testimony.  Evidence of his excellent adaptive functioning may be found in his independent living, the recognition he received for his attendance at group sessions and AA meetings, his efforts to help others with similar problems, and his ability to maintain his sobriety for a long period of time.

The ALJ remarked about Azema's language and writing skills.  The ALJ heard Azema testify and formed an opinion about his credibility.  The ALJ reviewed the medical records and reports of examinations by physicians and psychologists.  Based on these records, there was substantial evidence to support the ALJ's finding about Azema's language skills.

The ALJ's finding on Azema's writing skills was based on the procedural history and record.  R. 24.  It appears that the ALJ referred to documents which were completed by Ruby Azema.  <u>See</u> R. 316-323 and note R. 323; R. 44-45 and note R. 45; and R. 105-10.  There is not substantial evidence to support the ALJ's finding regarding the writing skills.  However, Azema has not demonstrated that he was prejudiced as a result of this error.  There is no reasonable probability that recognition that Azema relied on his wife to complete the forms would change the outcome of the ALJ's decision.[5]

Azema contends that the report by Dr. Mandich demonstrates that he was hospitalized for attempted suicide and therefore the ALJ's statement that he was not hospitalized for depression is contrary to the evidence.  Dr. Mandich's September 15, 2003 report contains the statement that Azema "was hospitalized two years ago at Bayou Oaks after he attempted suicide by drinking a lot

---

[5]  Where remand is sought for consideration of "new evidence," one of the elements that claimant must demonstrate is that there is a reasonable probability that the new evidence would change the outcome of the Secretary's decision.  <u>Ripley v. Chater</u>, 67 F.3d 552, 555 (5th Cir. 1995).

of beer and taking an overdose of nerve pills." R. 187.  There are no medical records to support this statement.  It does not appear in any of the LMHC records.  Dr. Mandich did not make the statement based on a medical record.  Instead, he was recording Azema's history as related by Azema.

The ALJ's decision was based on substantial evidence.

<u>Issue no. 3</u>.      Did the ALJ err in failing to accord controlling weight to Dr. Parsa's opinion?

Azema urges that the ALJ failed to give appropriate weight to the opinion of Dr. Parsa reflected in the mental residual functional capacity form, dated May 21, 2004.  He urges that, pursuant to <u>Newton v. Apfel</u>, 209 F.3d 448 (5th Cir. 2000), the ALJ could not reject Dr. Parsa's opinion without considering six factors found in 20 C.F.R. § 404.1527(d)(2).  He contends that Dr. Parsa's opinion is well supported by findings made by Dr. Fowler, Dr. Fontenelle and Dr. Spiers.

The ALJ considered the medical evidence at length.  Once he determined that Azema did not meet a listed impairment, he considered Azema's residual functional capacity.  After determining that the testimony from Azema and his wife was not credible, he reviewed the records at LMHC. He considered the opinions of the medical consultants, Dr. Parsa, Dr. Fowler and Dr. Fontenelle. He assigned no weight to the May 21, 2004 opinion by Dr. Parsa.

The ALJ found that Dr. Parsa's opinions were inconsistent with the records as a whole, including Dr. Parsa's longitudinal history with Azema.  Although Dr. Parsa had been seeing Azema for nearly two years, he did not provide any reference to the records of treatment at LMHC or Thibodaux Addictive.  Instead, those records demonstrated that Azema's condition improved with appropriate drug treatment.  The ALJ noted that the evidence demonstrated consistent earnings by Azema for 1990 through 1996.  The ALJ found that Azema's statement to Dr. Parsa of why he stopped working was self-serving.  The ALJ concluded that the physician/patient relationship was

the driving force behind the marked restrictions.  R. 28.

In <u>Newton v. Apfel</u>, 209 F. 3d 448, 453 (5th Cir. 2000), the Fifth Circuit said,

> The Court concludes that, absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2).  Additionally, if the ALJ determines that the treating physician's records are inconclusive or otherwise inadequate to receive controlling weight, absent other medical opinion evidence based on personal examination or treatment of the claimant, the ALJ must seek clarification or additional evidence from the treating physician in accordance with 20 C.F.R. § 404.1512 (e).

The ALJ relied on the reports of examining physicians in determining Azema's residual functional capacity.  He also relied on the four year record at LMHC, including many of Dr. Parsa's notes, in determining that the records contradicted Dr. Parsa's opinion of May 21, 2004.  The undersigned agrees with the Commissioner that the May 21, 2004 opinion is conclusory and completely at odds with the contemporaneous record of successful treatment and symptom management which Dr. Parsa and LMHC provided.  To the extent any support can be found for Dr. Parsa's conclusory May 24, 2005 opinion in the reports by Dr. Fontenelle or others, there is substantial evidence to support the ALJ's finding that Azema and his wife exaggerated his condition when they knew that the examination was being conducted for purposes of determining his eligibility for benefits.

The ALJ properly rejected the conclusory report from Dr. Parsa dated May 21, 2004.

<u>Issue no. 4</u>.      Did the ALJ err by substituting his lay opinion for that of a medical expert?

Dr. Fontenelle noted that Azema's wife provided social information because of Azema's limited cognitive ability.  R. 402.  Dr. Fontenelle did not conclude from the wife's participation that there were questions about Azema's performance in the interview and testing.  Azema contends that the ALJ relied on his wife's participation as support for his decision to reject Dr. Fontenelle's

conclusions.  Azema urges that the ALJ is substituting his opinion on the effect of his wife's participation for Dr. Fontenelle's opinion.

Azema misstates the ALJ's discussion and findings regarding Dr. Fontenelle's report.  The ALJ assigned no weight to the opinions and conclusions of Dr. Fontenelle.  R. 29.  The ALJ's summary of Dr. Fontenelle's August 16, 2006 report included Dr. Fontenelle's statement that Azema did not relate social information and his wife provided such information "as he appeared to have limitations in cognitive ability and self reporting of personal social information."  R. 29.  The ALJ reviewed at length the results of several tests, Dr. Fontenelle's assessment, the results of the mental status examination and his diagnostic impressions.  R. 29-30.  The ALJ rejected Dr. Fontenelle's conclusions because: (1) they were based on a single evaluation rather than a longitudinal review of the LMHC records; (2) of his acceptance of Azema's wife's recitation of his adaptive functioning; and (3) of his failure to consider the external incentive of monetary gain.  The ALJ did not reject Dr. Fontenelle's conclusions because Azema's wife provided a social history instead of Azema.  Rather, the ALJ rejected the conclusions because the record clearly demonstrated that Azema and his wife exaggerated his condition when they knew that the applications for Social Security benefits were at issue.

The ALJ did not substitute his lay opinion for that of Dr. Fontenelle.

## **RECOMMENDATION**

Accordingly, IT IS RECOMMENDED that defendant's cross-motion for summary judgment (Rec. doc. 16) be GRANTED and plaintiff's motion for summary judgment (Rec. doc. 14) be DENIED.

## **OBJECTIONS**

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within ten (10) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 23rd day of June, 2008.

**SALLY SHUSHAN**
**United States Magistrate Judge**